# HUMISTON *v.* WOOD.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
EASTERN DISTRICT OF PENNSYLVANIA.

Argued November 29, 1887. — Decided January 9, 1888.

In its opinion this court reviews the evidence offered by the plaintiff on the
trial of the case in the court below, none being offered there by the
defendants, and finds it sufficient to entitle the plaintiff to have the issue
submitted to the jury; and as the court below directed the jury to find
a verdict for the defendants, which was done, and a judgment was en-
tered on the verdict, this court reverses the judgment and remands the
cause, with directions to grant a new trial.

ASSUMPSIT. Plea : Non assumpsit. Verdict for defendant,
and judgment on the verdict. Plaintiff sued out this writ of
error. The case is stated in the opinion of the court.

*Mr. Francis E. Brewster* and *Mr. F. Carroll Brewster* for
plaintiff in error. *Mr. David W. Sellers* was with them on
the brief.

*Mr. Wayne McVeagh* for defendants in error. *Mr. A. H.
Wintersteen* was with him on the brief.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

This is an action of assumpsit brought by the plaintiff in
error to recover the sum of $25,000 as consideration for the
sale and transfer to the defendants below of the exclusive
right for the States of Pennsylvania and New Jersey to make,
use, and vend to others " Humiston's Atmospheric Hydrocar-
bon Apparatus " for generating light and heat, under letters-
patent dated June 24, 1879, No. 216,853, issued to Ransom
F. Humiston.

The defence relied upon was the plea of non-assumpsit. The
cause was tried to a jury, and the testimony having closed on
the part of the plaintiff, the defendants offering none, the
judge charged the jury to return a verdict for the defendants,

which was accordingly done. This ruling being duly excepted to, is now assigned for error, all the evidence in the cause being brought into the record by a bill of exceptions.

The principal witness on the part of the plaintiff below was Ransom F. Humiston, the patentee. He testified that, having received his patent on June 24, 1879, he was introduced to the defendants on the 2d of July by their superintendent, they being manufacturers of ranges and heaters. Having tried and tested the patented apparatus at their manufactory, a negotiation was entered into for the sale of the patent. In answer to the question how he proposed to sell it, the witness stated that he had no experience, but understood that the usual way was to form a stock company, and that if he did not find a purchaser he should organize one. One of the defendants asked him if he was particular about forming a stock company, and whether he would be willing to sell it to the firm. He said he would prefer to do this, and named $20,000 as the price for Pennsylvania, $5000 cash and $5000 in monthly instalments. After some further conversation, the defendant said that it would be easier to raise the money by forming a stock company, and went to the office of an attorney for the purpose of having the papers drawn to contain their agreement. At this time it was further agreed to include New Jersey at an additional price of $5000 on the same terms. The interview at the attorney's office when the papers were drawn was on July 31, 1879, and they were signed on the 2d of August. The witness added: "The substance of what was said by defendants was, that we will be the owners of the patent, but it is necessary to have certain names to an application for a charter, and we (myself, Myers, and Feltwell) consented to go on application articles." The papers referred to by the witness and put in evidence are two. The first is an agreement concluded July 31, 1879, the parties to which are Joseph Wood, James P. Wood, B. M. Feltwell, William H. Myers, and R. F. Humiston. It was thereby agreed that the parties named would "associate themselves together for the object of obtaining a charter of incorporation under the name and title of the 'American Light and Heat Company of

Philadelphia, Pennsylvania,' said organization to be perfected, and to be for the manufacture and sale of Humiston's atmospheric hydrocarbon apparatus for generating light and heat, and for the manufacture and sale of fixtures for the same; also, for the preparation and sale of oil suitable for the use of the said apparatus, and for any other business or matter necessary in carrying out the purposes aforesaid." The capital stock of the company was placed at $200,000, and it was provided that each of the parties should use his best endeavors in disposing of the stock. It was also provided "that the said party of the fifth part (Humiston) shall forthwith transfer to the other parties hereto the sole right of the improvement in apparatus for burning hydrocarbons for the States of Pennsylvania and New Jersey, letters-patent for said improvement being No. 216,853, and bearing date the 24th day of June, A.D. 1879, said transfer to cover any and all improvements hereafter to be made on said apparatus. That the said party of the fifth part shall receive from the concern or association or corporation for said patent right for said States the sum of $25,000, to be paid to him as follows, to wit: Five thousand dollars thereof within thirty days from the date hereof; the further sum of five thousand dollars in sixty days from the date hereof; the further sum of five thousand dollars in ninety days from the date hereof; the further sum of five thousand dollars in one hundred and twenty days from the date hereof; and the balance of five thousand dollars in one hundred and fifty days from the date hereof; the said payments to be made to the said party of the fifth part, or his legal representatives."

The other paper, also dated July 31, 1879, and signed by R. F. Humiston alone, is as follows:

"Whereas, by a certain agreement made the 31st day of July, 1879, wherein James P. Wood, Joseph Wood, Benjamin M. Feltwell, William H. Myers, and Ransom F. Humiston agreed to form a company for the manufacture and sale of Humiston's improvement in apparatus for burning hydrocarbons, and also agreed to pay the said Ransom F. Humiston for all his interest in the letters-patent for said improvement

for the States of Pennsylvania and New Jersey the sum of $25,000, to be raised, from sales of the stock of said company, in payments of $5000 each, the first payment to be made in thirty days after the execution of the agreement, and $5000 every thirty days thereafter until the whole sum be paid; therefore, in consideration of said agreement, I hereby agree with the said James P. Wood, Joseph Wood, Benjamin F. Feltwell, and William H. Myers, that I will not hold them personally responsible for the payment of the said sum of $25,000, but will look to them only as trustees for the sale of the stock of the said company and the payment to me of such moneys as may be received for such sales until the whole is paid; and I further agree, that if sufficient money be not received to pay the first instalment of $5000 when it becomes due, that I will extend the time of payment for ten, twenty, or thirty days, as may be necessary."

The witness further testified, that finding difficulties in the way of obtaining a charter in Pennsylvania that idea was abandoned at a meeting of the parties held on the 7th of October at the office of the defendants, when a committee was appointed to ascertain the laws of New Jersey relative to corporations in that state, to report at a subsequent meeting on November 3d. At that interview, the witness testifies, "I spoke to Joseph Wood, asked him when the committee would report, and Joseph said to me if you are perfectly satisfied we don't care about the company; we will take the ownership ourselves on the same terms (I mean as to price and payment). I cannot give the exact language; the substance was that James and Joseph Wood would take the patent on the same terms as the company had." In the meantime, as the witness further stated, the defendants received offers from various parties to buy territorial rights; amongst others, an offer, as he learned, from Joseph Wood for the county in which Newark, New Jersey, was, of $10,000, and asked the witness what he thought of it. He testifies that he replied: "I would take it, as it was twice as much as he had given for the whole stock. He said it was no one's business what they had given for it. He said Jersey City was in it. It is worth $40,000." The wit-

ness further testified that Joseph said "that parties in Pennsylvania were proposing to buy the state west of the Allegheny Mountains, and talked of $25,000 for about one-third of the state. He said it was worth more. I said it was his business and not mine. I wanted my pay." He also testified that Mr. Moran had seen the apparatus at the state fair, and entered into an agreement in writing with James P. Wood in reference to the patent. This writing Moran brought to the witness, and thereupon he says: "I told Mr. Wood that Moran had brought an article to me to be signed, and I stated that I was not the owner, but that they were, and then the agreement was signed. When I told James Wood this, he said to Moran, draw up the contract and I will look it over!" The witness further testified that the defendants issued circulars advertising the apparatus as their own, and employed him to go to Western Pennsylvania to make sales of rights under it for them. He remained in Pittsburg for that purpose about a month, corresponding with the defendants in reference to the subject. He also went to New York, upon letters of introduction from the defendants, to see about putting in the apparatus there. The witness further testified as follows: "In March, 1880, I called on defendants for some money and they handed me $200; I told them I needed money; I think $200 was the amount; defendants had paid me $640 on account of purchase money; the last payment in June or July, 1880, of $40. Defendants said they could not pay it then; this was in June, 1880. They gave no reason at that time. At a subsequent time, late in June, they called to see me, and said the reason they could not pay me was because there had been a great deal of competition in their business, and they had made nothing in two or three years, but that they had some contracts which were better, and if I would not press them they would pay me from time to time. I did not press the matter for the time being; that was the end at that time. I called on them for some money and they paid me this $40. I called on them again, and they said it was impossible. I told them $1000 was wanted. They said they were getting some money from some institution, but they were disappointed.

I asked them if they could let me have $500, and they said no; $200, no; $50, no; $10, and they said no; they had men to pay off and could not let me have $10, and I saw it was time to be looking after my securities. This was the last interview."

In the meantime, on the 30th of September, 1879, the witness had executed an assignment of the patent, reciting that "whereas James P. Wood, Joseph Wood, Benjamin M. Feltwell, and William H. Myers, of the city of Philadelphia and State of Pennsylvania, and said Ransom F. Humiston, have associated themselves together for the purpose of forming a company to manufacture and sell said apparatus and territorial rights under said patent, and have appointed the said Joseph Wood their trustee to take the title of said patent on behalf of said association, and are desirous of acquiring an interest therein," and assigning the patent accordingly for the States of Pennsylvania and New Jersey to Joseph Wood, trustee for the said association. The witness also testified to having received at various times from the defendants the sum of $616; of this $100, paid July 26, 1879, was before the execution of the contract, and for which he gave his due bill. He gave another due bill for $150, paid on the 8th of November, 1879. For the other sums no due bills were given. He testified that he understood that all the payments, except the first $100, were on account of purchase money.

The only other witness called was William H. Myers, a notary public, in whose office the agreements were drawn up, and whose name was put in, as he says, to furnish the number to get the charter, though he had no interest in the business or in the patent. He says the charter did not go through because money had to be paid, and that at a meeting of the parties in interest at his office he and James P. Wood were appointed a committee to obtain information in regard to getting a charter in New Jersey, but nothing further was done. Later in 1879, he says that he saw Joseph Wood, who told him it might be a good thing; the territory might be sold probably for sufficient to pay for the patent. "During the conversation we spoke of the difficulty of raising the company. Joseph said they had

thought something of taking it themselves and of abandoning the company; they thought territory sufficient might be sold to pay Humiston. Defendants spoke to me of sending the plaintiff to Pittsburg. . . . When they said they thought of abandoning the company, defendants employed me to make sale, and they said they would give me a commission — $5000 if $25,000 were realized, or a less sum a proportionate commission. This was about the 10th of December, 1879."

In the correspondence between the parties put in evidence there is a letter from Humiston, dated February 12, 1880, addressed to J. P. Wood & Co., in which it is stated that the writer had an interview with the superintendent of the elevated railroads in New York in regard to the use of the invention in running locomotives on the railroads. In that letter it is also stated that a party had called upon him "to know if I had yet sold the right to use my apparatus for railroad purposes in any of the states. I told him that I had sold the right for all purposes for Pennsylvania and New Jersey. He told me that I had made a great mistake, for that sale almost shut up New York City from her most important outlets. I told him that I felt confident that I could buy back the right for railroad purposes for those states at a reasonable figure. Now, I feel confident that this man means business, and he is known to be connected with a wealthy corporation, and I believe that if you will authorize me to sell just so much of the right as is applicable to railroad purposes alone for Pennsylvania and New Jersey, that I can do it within thirty days from this date, and bring you money enough to pay me off, and still you will own the right for the above-named states for all purposes except for use on railroads. Now, I want you to name your lowest price for sixty days. I mean that you shall give the refusal for sixty days at the price you name, selling only the railroad right. He is to call for my answer on Saturday P. M. at 3 o'clock. . . . Give me your minimum price, and I will get as much more as possible."

On the next day, February 13, 1880, the defendants, by a letter signed J. P. W. & Co., per Hinkle, addressed to Prof. R. F. Humiston, say: "Yours of yesterday received. We are

pleased to learn of your prospective success with railroads. With reference to price for our interest in Pennsylvania and New Jersey for railroad purposes, we leave it entirely with you to make such arrangements as you may deem best for the interest of all concerned."

On the 18th of February, 1880, at New York, Humiston writes again to James P. Wood & Co. on the subject of trying the heating apparatus for running locomotives, in which he says: "Please do not forget to talk with James about the money matters. I should not trouble you now, but I need it more than ever; send what you can spare." And also: "James will remember saying to me that until sales were made that I could have such small sums as I needed for my current expenses."

This was the substance of all the testimony in the case, so far as necessary to the determination of the question involved.

We think that this evidence was sufficient to entitle the plaintiff to have the issue submitted to the jury. We assume that the original negotiations prior to July 31, 1879, were merged in the written agreements of that date, which contemplated the organization of a corporation to receive an assignment of the patent for the States of Pennsylvania and New Jersey in consideration of $25,000, to be paid by the corporation, and the contemporary agreement by which the individual corporators, including the defendants, were exonerated from any personal responsibility for the payment of the consideration; Humiston thereby agreeing that he would look to them only as trustees for the sale of the stock of the company, and the payment to him of such moneys as might be received for such sales until the whole was paid. But this project was abandoned, and the tendency of Humiston's testimony certainly was to establish an agreement, between himself on the one part and James and Joseph Wood on the other, that the defendants would take the patent on the same terms as it had been agreed that the company should, that is to say, that the defendants were to stand in the matter precisely as it had been agreed that the corporation should if it had been formed. That being so, the defendants would succeed to the obligation

of the company to pay the consideration of $25,000 absolutely and unconditionally. The collateral agreement of July 31, 1879, by which the individual corporators were not to be personally responsible for the consideration, would thus be rendered nugatory, as it was only intended to have effect in the event of the organization of the corporation.

Upon this state of facts, if proven to their satisfaction, the jury would have been warranted in finding a verdict for the plaintiff. It was error, therefore, in the Circuit Court to direct a verdict for the defendants. For this error its

*Judgment is reversed, and the cause is remanded with directions to grant a new trial.*